UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MELVIN H. MILLER,

                     Petitioner,

     v.

SUPERINTENDENT FENNESSEY,

                 Respondent.

**DECISION AND ORDER**

1:20-CV-00354 EAW

---

## I.    <u>INTRODUCTION</u>

*Pro se* petitioner Melvin H. Miller ("Petitioner") filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 while he was in Respondent's custody.[1]  (Dkt. 1).  Petitioner challenges the constitutionality of the judgment entered against him on July 28, 2016, in New York State, Wyoming County Court (Mohun, J.), following a nonjury verdict convicting him of, among other offenses, second-degree burglary (New York Penal Law ("P.L.") § 140.25(2)), petit larceny (P.L. § 155.25), and first-degree criminal contempt (P.L. § 215.51(b)(iv)).  (*Id.* at 1).[2]

---

[1]     On February 24, 2021, Petitioner was released from custody to parole supervision. *See* https://nysdoccslookup.doccs.ny.gov/ (results for DIN 16B2168) (last accessed Apr. 18, 2024).

[2]     Page citations to Petitioner's pleadings are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.  Page citations to Respondent's pleadings are to the original pagination.

The matter was referred to United States Magistrate Judge H. Kenneth Schroeder pursuant to 28 U.S.C. § 636(b)(1).  (Dkt. 13).  The Magistrate Judge issued a Decision and Order (Dkt. 22) denying without prejudice Petitioner's motion to amend the petition (Dkt. 18).  The parties did not pursue any review of that Decision and Order before the district court, nor did the district court engage in any such review.[3]

For the reasons below, the Decision and Order is rejected in part and accepted in part; the motion to amend is granted in part and denied in part with prejudice; the request for a writ of habeas corpus is denied; and the petition, as amended, is dismissed.

## II.   **BACKGROUND**

### A.   **Indictment**

A Wyoming County grand jury returned indictment 7497 on January 12, 2016, charging Petitioner with 24 counts including second-degree burglary (P.L. § 140.25) (Count 2); petit larceny (P.L. § 155.25) (Count 6); and first-degree criminal contempt (P.L. § 215.51(b)(iv) (Count 24).  (SR: 167-77).[4]  Counts 1 through 6 related to actions Petitioner took at the residence of his former girlfriend, Jennifer Woodburn ("Woodburn"), on the morning of August 31, 2015.  Counts 7 through 23 related to actions Petitioner took after he left Woodburn's house.  Count 24 related to Petitioner's alleged violation of a protective order during his pretrial detention.

---

[3]      This matter was transferred to the undersigned on May 15, 2024.  (Dkt. 24).

[4]      Citations to "SR:" refer to the Bates-stamped page numbers at the bottom of the state court records, filed by Respondent at Docket 11-2.

**B.      Trial**

Petitioner's two-day nonjury trial commenced on June 27, 2016, before Wyoming

County Court Judge Michael M. Mohun ("trial court").  The parties stipulated that there

was an order of protection in place against Petitioner in Woodburn's favor, effective

August 31, 2015, until March 1, 2016.  (T: 7-9).[5]  Prior to the commencement of testimony,

the trial court granted the prosecution's motion to dismiss Count 1 (second-degree criminal

trespass), Count 22 (unlawful possession of marijuana), and Count 23 (seventh-degree

criminal possession of a controlled substance).  (T: 11-12).

**1.      Prosecution's Case**

Woodburn testified that on August 31, 2015, she resided with her father at 1352

Friedman Road in the Town of Bennington.  (T: 111-13).  Woodburn's father lived in the

in-law apartment, and she occupied the main portion of the house.  (*Id.*).  Prior to August

31, 2015, Woodburn and Petitioner had been in a romantic relationship for about five years

and had moved in together in July or August of 2014.  (T: 118).  In May of 2015, Petitioner

moved out of the Friedman Road residence because of a conflict between him and members

of Woodburn's family.  (T: 68-69, 118-19).

Among other pets, Woodburn had two dogs—"Shelby," an English Pointer mix;

and "Tasha," a Rottweiler.  (T: 116).  Although she and Petitioner had obtained the dogs

together, they were licensed in her name.  (T: 116, 163-64).  On direct examination, she

---

[5]      Citations to "T:" refer to pages of the trial transcript.  Citations to "S:" refer to pages
of the sentencing transcript.  Page citations to the transcripts are to the original pagination.
All of the transcripts from Petitioner's state court proceeding are filed at Docket 11-4.

testified that, on August 31, 2015, the dogs were hers alone and she had custody of them. (T: 116).  However, on cross-examination, Woodburn answered "yes" when defense counsel asked whether she and Petitioner had joint custody of the dogs.  (T: 164-65, 180).

Woodburn testified that after he moved out, if Petitioner wanted to have visitation with Shelby and Tasha, he would seek her permission beforehand.  (T: 119-20).  Petitioner contacted Woodburn on an almost daily basis for permission to enter the house to take out the dogs.  (T: 121).  For a while, the arrangement worked well but became "a little difficult" when Woodburn sensed that Petitioner wanted to keep the dogs, and she "didn't like that." (*Id.*).  Woodburn was "getting upset" because she "didn't want to let him see the dogs," which "were starting to be used as a pawn" between them.  (T: 124, 162).  At one point prior to August 31, 2015, Woodburn had called the police about the situation involving the dogs and was told she "needed to take it up in the courts."  (T: 124).

On the morning of August 31, 2015, Petitioner called Woodburn and wanted to take the dogs, but Woodburn told him that he could not do so because she had planned to take them on an outing that day.  (T: 121-22, 124, 148-49, 161-62, 190-91).  During the call, Petitioner called her a "c--t" and a "b---h."  (T: 133-34, 194).  This prompted Woodburn to call 911.  (T: 133-34).

When Petitioner arrived at Woodburn's house at about 11 a.m., she was upstairs in her bedroom with the two dogs, and all the doors to the house were locked.  (T: 134-35, 193).  Woodburn heard Petitioner try to open the front door and the sliding glass door at the back of the house.  (T: 135-36).  Petitioner was "yelling" and "really enraged" as he

was trying to get into the house, and Woodburn was afraid he was going to hurt her.  (T: 136-39, 192-93).

Woodburn testified that when Petitioner could not get in through any of the exterior doors, he climbed in through an unlocked porch window.  (T: 139).  Woodburn was aware of Petitioner previously using the window "[m]aybe once" to enter the house.  (T: 176).  However, on the morning of August 31, Petitioner did not have permission to enter the house through the window.  (T: 139-40, 193-94).

From her bedroom on the second floor, Woodburn heard Petitioner come upstairs.  (T: 140, 141).  Woodburn was leaning against the locked bedroom door to keep it shut.  (T: 141).  Petitioner "barged through" the door which injured Woodburn's wrist and arm and damaged the door.  (T: 142-47).  Petitioner called for the dogs; Shelby responded and followed him down the stairs.  (T: 142, 148).  Woodburn pursued them and tried to stop Petitioner from leaving with Shelby.  (T: 148).  She had not given Petitioner permission or authority to take her dog.  (*Id.*).

At this point, Woodburn was still talking to the 911 operator.  (T: 149).  A recording of the 911 call was played in open court.  (T: 149-50).  Woodburn identified her voice on the 911 call saying, "get of here" to Petitioner; that she "need[ed] help here immediately;" that her "ex" had "just broke into [her] house" and "just tried to steal [her] dogs;" and that she "was so afraid he was going to kill [her]." (T: 149-52).

When he reached the front door, Petitioner let go of Shelby, walked out of the house, got into his truck, and drove away.  (T: 153).  Because Woodburn had noticed the smell of

alcohol on Petitioner's breath, she called 911 again to report that he had been drinking and driving.  (T: 154-55).

Woodburn's neighbor, Shannon Albano ("Albano"), testified that at about 11 a.m. on August 31, 2015, she was in the front yard with her two young children when she saw Petitioner pull into Woodburn's driveway.  (T: 67-68, 70).  She knew Petitioner because he once lived with Woodburn at that residence; however, he "wasn't supposed to be there" that day.  (T: 68-69, 72, 73).  Petitioner parked his truck in the middle of the driveway, got out, walked up onto the front porch, and started banging on the door.  (T: 72, 77-78).  When no one answered, Petitioner walked all the way around the back of the house and returned to the front porch.  (T: 77-78).  Albano saw Petitioner push open a small window on the porch and climb through it into the house.  (T: 72, 78-79).

Albano then heard Woodburn yell at Petitioner, push him out the front door, and slam the window down.  (T: 72-73).  Petitioner appeared "very upset" as he "barreled" out of Woodburn's driveway in his pick-up truck.  (T: 74).

Meanwhile, Village of Attica Police Department Officer Nicholas Wright ("Officer Wright") heard the 911 dispatch regarding a home invasion at Woodburn's house.  (T: 218).  Officer Wright parked on West Main Street where he would be likely to intercept Petitioner if, as Officer Wright expected, Petitioner headed back to his house on Washington Street.  (*Id.*).  When Officer Wright saw Petitioner's truck, he activated his emergency lights.  (T: 219).  Petitioner did not stop but instead jerked his vehicle back and forth in his lane, crossing the yellow and white lines on the road; he also passed two vehicles in a no-passing zone while going fifteen miles over the speed limit.  (T: 220, 223,

225).  At that point, Officer Wright activated his siren.  (T: 223).  Petitioner failed to stop at a stop sign, crossed the double yellow line to pass three or four cars, and came within a couple of feet of striking an occupied car and a pedestrian.  (T: 226-28).

Petitioner then turned into his driveway on Washington Street at a very high rate of speed, hitting the house with his driver's side mirror.  (T: 229).  Petitioner exited the car and attempted to run away.  (T: 230).  After about 15 seconds, Petitioner stopped and got down on the ground, in compliance with Officer Wright's orders.  However, as soon as Officer Wright re-holstered his service weapon, Petitioner got up and started to run away again.  (T: 231).  Officer Wright then used his taser on Petitioner, causing him to fall to the ground.  (T: 232).

However, Petitioner still would not put his hands behind his back.  (*Id.*).  Officer Wright had to use the taser twice more before Petitioner put his hands behind his back and allowed Officer Wright to handcuff him.  (T: 232-33).  Officer Wright was wearing a "Vievu" body camera which recorded Petitioner's arrest; the video recording was introduced into evidence as People's Exhibit 23 and played in open court.  (T: 250-54).[6]

Officer Wright read Petitioner *Miranda* warnings, and Petitioner stated he understood them.  (T: 233, 236).  Officer Wright asked Petitioner why he had run away,

---

[6]     None of the trial exhibits were supplied by Respondent in connection with the answer.  However, the Court finds that it is unnecessary to request copies of them in order to resolve the petition.  In particular, the relevant contents of the recordings of the 911 call and the body camera footage were referenced in various witnesses' testimony and quoted in the state appellate court's decision affirming Petitioner's conviction on direct appeal.

and Petitioner replied that "his wife called the cops because he was trying to get his dogs." (T: 238; *see also* T: 247-48, 249).

Presumably because he had been tased three times, Petitioner was brought to the hospital and released that day; he then was brought to the State Police Barracks in Warsaw for processing.  (T: 207, 211).  He eventually was transported to the Wyoming County Jail, where he remained during the pre-trial proceedings.  (T: 40, 53).

Despite the restraining order entered after the August 31, 2015 incident, Petitioner called Woodburn's home phone and mobile phone from the Wyoming County Jail at least 52 times between October 18, 2015, and November 4, 2015.  (T: 58, 156-58).  Wyoming County Sheriff's Office Sergeant Colin Reagan ("Reagan") testified that the prosecution's office provided him with a CD containing recordings of these 52 phone calls; he listened to the eight calls identified as pertinent to the indictment against Petitioner.  (T: 58). Woodburn did not answer all 52 calls but in some of them, Petitioner referred to having already given her $200; repeatedly directed her to write to the local courts and retract her statements against him; and promised that after she did so, he would give her an additional $500.  (T: 62).  Reagan noted that Petitioner sounded "calm" initially and was "nice" to Woodburn.  (*Id.*).  Over time, Petitioner "became more aggressive," "would yell" at Woodburn, and was "coercive towards her."  (*Id.*).

### 2.    Motion for a Trial Order of Dismissal

After the prosecution rested, defense counsel made a motion for a trial order of dismissal as to several counts of the indictment.  As relevant here, defense counsel moved to dismiss Counts 2 and 6 involving larceny, arguing that the "evidence ha[d] conclusively

shown that [Petitioner] had a legitimate claim of right to the dogs" and that the prosecution had "offered no evidence to the contrary and no evidence as to the element of intent."  (T: 296).  Defense counsel also moved to dismiss Count 24, charging first-degree criminal contempt, arguing that the prosecution had "failed to show [Petitioner]'s intent was to harass, alarm or annoy or threaten" Woodburn and had "failed to prove that there was no legitimate purpose for the communications."  (T: 297).  The trial court found that the evidence was legally sufficient to establish the offenses charged in the indictment as well as any lesser included offenses, and it denied the motion.  (T: 297, 298).

### 3.    Defense Case

Petitioner acknowledged that the dogs were registered solely to Woodburn, but he said that he and Woodburn owned them together.  (T: 319, 337-38).  Woodburn had said he could not take the dogs the previous day, August 30, 2015, but she had "no problems" with him taking the dogs on August 31.  (T: 304-05, 336-37).  When he called her on the way over to her house, they argued about him not being able to take the dogs the previous day. (T: 317).  Woodburn "started screaming" at Petitioner, and he told her to "stop acting like a . . . C word" and that he was coming to take the dogs. (T: 318).  Woodburn responded, "all right," and said that she was leaving to go out with her father.  (*Id.*).

When Petitioner arrived at the house, he did not think Woodburn was home.  (T: 313, 318).  The doors were locked so he climbed through the porch window as he had done several times before with her permission.  (T: 310, 312).  He stated that it was "[their] normal routine" to enter the house through the window.  (T: 313).  He went upstairs to get the dogs and found that the door to Woodburn's bedroom would not open; he thought that

maybe Tasha, the larger dog, was lying against the door. (T: 314-15). The door previously had been broken and when he leaned against it, it just "popped open." (*Id.*). He was surprised to see Woodburn in the bedroom. (T: 315).

Petitioner said he "wasn't trying to take the dogs at all" that morning; nor did he try to take either dog as he was leaving the house. (T: 316, 320). Petitioner conceded that, as reflected on the body camera footage, he told the police, "she stole my dogs, stole my money." (T: 335). Petitioner did not remember saying, "all I want is one of them," stating that he had had difficulty seeing and hearing the video. (T: 335-36). He said that if Woodburn told him he could not take the dogs, he would have "never went there." (T: 336). Petitioner agreed that Woodburn "was able to restrict [his] access to the dogs." (T: 337).

At the close of Petitioner's testimony, the defense rested. Defense counsel did not renew his motion to dismiss but proceeded immediately to his summation. (T: 345).

### 4. **Verdict**

The trial court returned a verdict of guilty as to 17 counts in the indictment including, as relevant to this petition, second-degree burglary in violation of P.L. § 140.25(2), a class C felony (Count 2); petit larceny in violation of P.L. § 155.25, a class A misdemeanor (Count 6); and first-degree criminal contempt in violation of P.L. § 215.51(b)(iv), a class E felony (Count 24). (T: 359-62). Petitioner was acquitted of first-degree reckless endangerment (P.L. § 120.25), a class D felony; and three traffic violations. (*Id.*).

- 10 -

### 5.      Motion to Set Aside the Verdict

Prior to the scheduled sentencing hearing on July 28, 2016, Petitioner filed a *pro se* motion to set aside the verdict pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30 ("330 motion").  (SR: 206-46).  Petitioner argued that he had permission to enter the house and offered an affidavit from Paul Griffith ("Griffith"), Woodburn's father.  (SR: 13).  Griffith averred that he had given Petitioner permission to enter the house at any time.  (*Id.*).  Petitioner also contended that the prosecutor had coerced Woodburn into providing false testimony against him.  In support, he supplied an affidavit from Woodburn stating in relevant part as follows:

> When I was on the witness stand, the DA stopped my testimony and escorted me into a room.  He pressured me to say what he wanted me to say.  If I did not he threatened me with criminal punishment. . . . If I was not removed from the courtroom and pressured my testimony would have been different.

(SR: 12).

The prosecutor filed an affirmation in opposition contradicting Woodburn's factual allegations.  (SR: 247-53).  The prosecutor explained that during Woodburn's testimony, he had applied under C.P.L. § 60.35(1) to impeach her; Woodburn was excused from the courtroom to allow the parties to argue the issue.  (SR: 252).  The prosecutor stated that at no time did he leave the courtroom, let alone "escort" Woodburn to a room.  (*Id.*).  Nor did he speak to Woodburn until he resumed questioning her on the record.  (*Id.*).  The prosecutor stated that the only attorney who left the courtroom during that time was defense counsel.  (*Id.*).

### 6.   Sentencing

At the commencement of the sentencing hearing, the trial court heard oral argument on the 330 motion and summarily denied it.  (S: 3-5).

Petitioner admitted his status as a second felony offender.  (S: 12-13).  Instead of the maximum 15-year sentence requested by the prosecution, the trial court imposed an aggregate determinate term of seven years' imprisonment plus five years' post-release supervision.  (S: 22-24).

### C.   First Motion to Vacate the Judgment

Before his direct appeal was perfected, Petitioner filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 in the trial court on February 1, 2017 ("first 440 motion").  (SR: 1-74).  Petitioner raised a raft of allegations, including that Woodburn was coerced into cooperating and testifying for the prosecution, the video recordings from the arresting officer's body camera were "doctored," there was no toxicology report of Petitioner's blood alcohol content, the police planted evidence in Petitioner's vehicle, the arresting officer's testimony was inconsistent, Petitioner had Woodburn's permission to enter the house and therefore could not have committed the crime of burglary, Petitioner did not receive a fair trial because the prosecutor "tampered" with Woodburn and forced her testify, Petitioner was not indicted within 45 days of the incident, Petitioner did not receive a preliminary hearing, and defense counsel was ineffective.  The prosecution filed an affirmation in opposition.  (SR: 75-96).  The prosecutor argued that the motion was subject to mandatory denial under C.P.L. § 440.10(2)(b) because nearly all of the grounds were record-based; and that it was subject to discretionary denial without a hearing under

C.P.L. § 440.10(3)(b) because none of the grounds were supported by any evidence. Petitioner filed a reply.  (SR: 97-111).

The trial court denied the motion in a written decision and order dated August 28, 2017 ("440 order").  (SR: 114-19).  The trial court held that "[w]ith the exception of the ineffective assistance of counsel claim," it had "already considered, and rejected, virtually all of the defendant's contentions when it denied his CPL Article 330 motion on July 28, 2016."  (SR: 116).  The trial court also found that Petitioner's "conviction is appealable or pending on appeal, and all of the issues he raises are matters for which 'sufficient facts appear on the record [ . . . ] to permit adequate review thereof upon such appeal.'"  (*Id.*) (brackets and ellipsis in original) (quoting N.Y. Crim. Proc. Law § 440.10(2)(b)).  As a result, the trial court found that "the motion must be denied."  (*Id.*).

The trial court noted that Petitioner's "primary item of 'new evidence,'" an affidavit from Woodburn, previously had been submitted in connection with the 330 motion.  (*Id.*). To the extent that Petitioner relied on Woodburn's affidavit as evidence of prosecutorial misconduct, the trial court found "her vague allegations of feeling 'pressured' during a break in her direct testimony 'to say what [the prosecutor] wanted me to say' are insufficient to support this claim."  (SR: 117 (alteration in original)).  While Woodburn "made it perfectly clear" throughout all her testimony that she "had no desire to see the defendant convicted" (*id.*), she nonetheless "acknowledge[d] in her affidavit that she was upset with the defendant 'the day he crawled through the window,' she 'locked the doors so he would not take the dogs that day,' and she 'called 911.'"  (*Id.* (citation to record omitted in original)).  The trial court found that "to the extent that [Woodburn's] affidavit

makes specific assertions about the facts of the case, it does not conflict with her trial testimony." (*Id.*).

The trial court held that since Woodburn's affidavit "does not directly contradict" her testimony, it provided "no support" for Petitioner's claim that the prosecutor "coerced Woodburn into giving 'false' testimony." (*Id.*). Although Woodburn averred that "her trial testimony 'would have been different' in the absence of the 'pressure'" from the prosecutor, she "[n]otably" did not identify "any particular part of her trial testimony" that was "false." (*Id.* (citation to record omitted in original)).

The trial court determined that Petitioner's "claims of 'doctored' video recordings, 'planted' evidence, and other police and prosecutorial misconduct" were "similarly unsubstantiated." (*Id.*). Moreover, the trial court found that defense counsel "received a full and fair opportunity to attack the credibility of the police witnesses and to challenge the evidence they gave." (*Id.*).

Finally, the trial court determined that Petitioner's "conclusory" ineffective assistance claim in his opening motion papers was "too general to merit relief." (*Id.*). The belatedly provided details about counsel's shortcomings "merely makes it apparent that all of his complaints about his attorneys involve matters for which facts appear on the record sufficient to permit review of the claim through the direct appeal of the conviction." (SR: 117-18). Accordingly, the trial court determined that it must deny the motion under C.P.L. § 440.10(2)(b). (SR: 118).

Petitioner sought leave to appeal denial of the first 440 motion to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division").

(SR: 120-31).   The prosecution opposed the leave application.   (SR: 132-33).   The Appellate Division denied leave to appeal on January 10, 2018.  (SR: 135).

### D.   Direct Appeal

Represented by new counsel, Petitioner pursued a direct appeal of his conviction. (SR: 137-58).  In his counseled appellate brief, Petitioner asserted that: (1) the prosecution failed to present evidence of his intent to steal the dogs or deprive Woodburn of her ownership interest in them, and therefore the convictions for petit larceny and second-degree burglary were unsupported by legally sufficient evidence; (2) even if there was legally sufficient evidence on these counts, the convictions were manifestly contrary to the weight of the evidence; and (3) the first-degree criminal contempt conviction is unsupported by legally sufficient evidence as there was no proof showing that Petitioner intended to harass, annoy, threaten, or alarm Woodburn through his phone calls made in violation of the order of protection.  (SR: 138).

The prosecution filed an opposition brief.   (SR: 306-32).   In particular, the prosecution contended that the legal sufficiency claims were unpreserved because defense counsel failed to renew his motion for a trial order of dismissal after the defense rested. (SR: 321).   Appellate counsel filed a reply brief.   (SR: 395-405).   In response to the prosecution's preservation argument, appellate counsel asserted that, in a nonjury trial, there is no need to separate legal and factual arguments.  (SR: 396).  Therefore, appellate counsel argued that the legal sufficiency arguments were properly preserved by defense counsel's summation, which argued that the prosecution had failed to prove Petitioner's guilt beyond a reasonable doubt.  (*Id.*).

Petitioner filed a *pro se* supplemental appellate brief asserting that the prosecutor abused his authority and coerced Woodburn into providing false testimony against him; the prosecutor relied on evidence (the body camera footage) that he knew had been tampered with; police witnesses provided false and misleading testimony; and the trial court was prejudiced against the defense. (SR: 333-66). The prosecution filed a brief in opposition. (SR: 367-94). Petitioner filed a reply. (SR: 406-31).

The Appellate Division affirmed the judgment on March 23, 2018. *People v. Miller*, 159 A.D.3d 1608 (4th Dep't 2018); (SR: 432-35). The Appellate Division found that "the contentions raised in defendant's *pro se* supplemental brief . . . are unpreserved for [appellate] review," *id.* at 1610 (citing N.Y. Crim. Proc. Law § 470.05(2)), "and are in any event without merit." *Id.*

As to the claim that the evidence was legally insufficient to support the convictions for petit larceny and second-degree burglary, the Appellate Division agreed with the prosecution's preservation argument, holding that "[b]y failing to renew his motion to dismiss at the close of proof, defendant failed to preserve for our review his challenges to the legal sufficiency of the evidence." *Id.* at 1609. The Appellate Division noted that as part of its review of Petitioner's claim that the verdict was against the weight of the evidence, it "necessarily review[ed] the evidence adduced to each of the elements of the crimes," *id.* (quoting *People v. Stephenson*, 104 A.D.3d 1277, 1278 (4th Dep't 2013)).

The Appellate Division was divided on the merits of Petitioner's legal sufficiency and weight of the evidence claims. A majority of the panel "reject[ed] defendant's contention that the verdict is against the weight of the evidence with respect to" petit

larceny and second-degree burglary. *Id.* at 1609. The majority found that "[t]he evidence, including the recording of a 911 call made by the complainant, defendant's ex-girlfriend, and the arresting officer's body camera footage, establishes that defendant unlawfully entered the complainant's residence with the intent to steal her dogs." *Id.* The majority "conclude[d] that the finder of fact heard all of the testimony and was in the best position to assess the witnesses' credibility." *Id.* at 1610.

The two dissenting justices "conclude[d] that the verdict is against the weight of the evidence with respect to the crimes of burglary in the second degree and petit larceny," and voted to reverse the parts of the judgment convicting Petitioner of those offenses. *Id.* at 1611 (dissenting opn.).

In his leave letter (SR: 436-39), appellate counsel asserted that "[f]rom a legal perspective this case should be reviewed to clarify what a defendant must do in a non-jury trial to preserve the legal question of evidentiary insufficiency." (SR: 436). Appellate counsel argued that the Appellate Division's preservation holding "was based on an unduly narrow reading of the case law" and "urged" the Court of Appeals "to rule that no separate motion is required to preserve a sufficiency issue in a non-jury trial when that issue is raised with specificity in the summation or closing argument." (SR: 437). Appellate counsel then argued the merits of Petitioner's legal sufficiency claim. (SR: 438-39). In the leave letter, appellate counsel did not reference any of the other claims from his appellate brief or Petitioner's *pro se* supplemental appellate brief.

The prosecution opposed the granting of leave, arguing that appellate counsel had relied on overruled precedent and improperly conflated a judge's dual roles at a nonjury

trial.  (SR: 440-42).  The New York Court of Appeals denied leave to appeal on June 18, 2018.  *People v. Miller*, 31 N.Y.3d 1151 (2018); (SR:443).

### E.    Other Collateral Motions in State Court

On November 7, 2018, Petitioner filed a second *pro se* motion to vacate pursuant to C.P.L. § 440.10 ("second 440 motion"), alleging ineffective assistance of counsel.  (SR: 440-74).  The prosecution opposed the motion.  (SR: 475-85).  Petitioner filed a reply.  (SR: 486-93).  The trial court denied the motion on April 26, 2019, finding the claims meritless and subject to mandatory dismissal under C.P.L. § 440.10(2)(c).  (SR: 494-96).  There is no documentation in the state court records indicating that Petitioner sought leave to appeal to the Appellate Division.

On July 20, 2019, Petitioner filed a *pro se* motion for a writ of error *coram nobis* ("*coram nobis* motion") alleging ineffective assistance of appellate counsel.  (SR: 497-523).  The prosecution filed an affirmation in opposition.  (SR: 524-32).  The Appellate Division summarily denied the motion on September 27, 2019.  (SR: 533).  The New York Court of Appeals denied leave to appeal on December 31, 2019.  (SR: 542).

As Respondent notes (Dkt. 10 at 9 n.4), the second 440 motion and the *coram nobis* motion served to provide statutory tolling of the limitations period pursuant 28 U.S.C. § 2244(d)(2) but otherwise have no bearing on this proceeding.  That is, the motions did not include any substantive claims asserted in the petition.

### F.    Federal Habeas Petition

Petitioner's timely habeas petition raises the following grounds for relief:  (1) he is actually innocent of second-degree burglary and petit larceny (Ground One); (2) the

prosecution knowingly introduced police body-camera video that had been tampered with (Ground Two); (3) the evidence was legally insufficient to support the second-degree burglary and petit larceny convictions (Ground Three); and (4) the prosecutor coerced Woodburn to testify falsely at trial (Ground Four).  (*See* Dkt. 1 at 6-7).

Respondent answered the petition (Dkt. 11) and filed a memorandum in opposition (Dkt. 10).  Petitioner filed a reply.  (Dkt. 19).

At the same time as he filed the reply, Petitioner filed a motion to amend the petition to add what he characterized as a fifth ground for relief:

> Trial counsel did not file a second trial order of dismissal which effected [sic] the direct appeal and the appellate counsel did not address this issue as ineffective trial counsel in his brief for the direct appeal, numerous errors by both counsels including failure to object.

(Dkt. 18 at 1).  Petitioner did not file a proposed amended petition along with the motion to amend.  Respondent did not respond to the motion to amend.

The Magistrate Judge issued a Decision and Order finding that the proposed "new claim" was unexhausted and did not "relate back" to the original petition for purposes of Federal Rule of Civil Procedure 15(c).  (Dkt. 22 at 4).  The Magistrate Judge denied the motion without prejudice and stated that if Petitioner still sought to amend the petition, "he must file a motion to amend (along with a proposed [a]mended [p]etition setting forth all of his claims) and explain how his 'new' claims 'relate back' to the original [p]etition." (*Id.*).  The Decision and Order did not notify Petitioner that he could seek further review of the denial of the motion to amend.  Petitioner did not do so; nor did he file a renewed motion to amend.

### III.   <u>JURISDICTION</u>

When Petitioner filed his federal habeas petition on March 18, 2020 (Dkt. 1 at 9), he was in Respondent's custody at Mid-State Correctional Facility (*id.* at 1), serving the sentence on the judgment of conviction attacked in the petition.  Accordingly, Petitioner satisfied the habeas statute's "in custody" requirement.  *See Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) ("The federal habeas corpus statute requires that the applicant must be 'in custody' when the application for habeas corpus is filed.").

Petitioner's release from prison to parole supervision during the pendency of this proceeding did not divest this Court of jurisdiction over the petition.  *See id.* (holding that once federal habeas jurisdiction has attached in the district court, it is not defeated by the petitioner's release from custody prior to completion of proceedings on the habeas application).

Although Petitioner is no longer serving the sentence originally imposed for his felony conviction, the presumption of collateral consequences is appropriate because the petition challenges the constitutionality of that conviction.  *See Anderson v. Smith*, 751 F.2d 96, 100 (2d Cir. 1984) (finding that habeas petition challenging an attempted robbery conviction was not moot after petitioner's release from custody "since a felony conviction carries certain 'collateral consequences'").  Accordingly, the petition continues to present a justiciable controversy amenable to review by this Court.

## IV.    DECISION AND ORDER DENYING THE MOTION TO AMEND

### A.    Proper Characterization of the Motion to Amend

Courts in in this Circuit have varied on whether motions to amend a habeas petition under 28 U.S.C. § 2254, as well as motions to stay such petitions, are treated as non-dispositive or dispositive motions. *Williams v. Shanley*, No. 20CV688JLSMJR, 2022 WL 17629736, at *5 n.1 (W.D.N.Y. Dec. 12, 2022) (collecting cases). The Second Circuit has not ruled on these questions; nor has the Supreme Court.

The Ninth Circuit has considered whether motions to stay § 2254 petitions, which often accompany motions to amend such petitions, are non-dispositive or dispositive. After examining the interplay between the one-year statute of limitations on § 2254 petitions; the "total exhaustion" rule set forth in *Rose v. Lundy*, 455 U.S. 509 (1982);[7] and the strict limitations placed on the use of stay-and-abeyance procedures by the Supreme Court in *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005), the Ninth Circuit held that "a motion to stay and abey section 2254 proceedings is generally (but not always) dispositive of the unexhausted claims." *Mitchell*, 791 F.3d at 1171. The Ninth Circuit explained:

> "[P]etitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims," [*Rhines*, 544 U.S. at 275], because, absent a stay, they are presented with two choices, each of which will ordinarily result in precluding some or all of their claims: Either they may voluntary dismiss unexhausted claims, proceeding on only the exhausted ones, or they may decline to do so, leading to dismissal of the entire petition. Either kind of dismissal would be, in form, without prejudice. But, because the one-year

---

[7]    In *Rose v. Lundy*, the Supreme Court held that "district courts were required to dismiss without prejudice 'mixed' section 2254 habeas petitions—that is, those including both exhausted and unexhausted claims." *Mitchell v. Valenzuela*, 791 F.3d 1166, 1170-71 (9th Cir. 2015) (citing 455 U.S. at 510).

statute of limitations is not tolled while the federal petition is pending, *Duncan v. Walker*, 533 U.S. 167, 181, 121 S. Ct. 2120, 150 L.Ed.2d 251 (2001), and because state proceedings can be lengthy and unpredictable, in most cases either option will mean that a petitioner will be barred from federal review of some or all of [her] claims by the time [s]he exhausts them.

*Id.* at 1171-72 (first alteration in original).

For instance, if a petitioner elects to voluntarily dismiss his unexhausted claims, "it is very likely that final state court exhaustion of unexhausted claims will come too late to allow the claims to be heard in federal court." *Id.* at 1172. There are generally two reasons for this: First, "the statute of limitations period will have run on the claims and they will not relate back to the filing of the petition because they do not 'arise[ ] from the same core of operative facts as a claim contained in the original petition.'" *Id.* (alteration in original) (quoting *Ford v. Gonzalez*, 683 F.3d 1230, 1237 n.3 (9th Cir. 2012) (internal quotation marks omitted in original)). Second, "the remaining federal habeas petition will have been decided by the time the state courts act on the new habeas claims, triggering the onerous requirements for filing a second or successive habeas petition, 28 U.S.C. § 2244(b)." *Id.* Sometimes, both circumstances will confront the habeas petitioner. *Id.*

If, on the other hand, the petitioner "chooses to accept dismissal of the entire petition" under the total exhaustion rule set forth in *Rose v. Lundy*, 455 U.S. at 510, the petitioner "will very likely be barred from reasserting any of [her] claims in federal court by AEDPA's[8] statute of limitations." *Mitchell*, 791 F.3d at 1172. Whether the petitioner chooses to withdraw only the unexhausted claims or to accept dismissal of a mixed petition

---

[8]    "AEDPA" refers to the Antiterrorism and Effective Death Penalty Act of 1996.

containing exhausted and unexhausted claims under the total exhaustion rule, the "result is the same as to the unexhausted claims:  The petitioner will lose the opportunity ever to present those claims to a federal habeas court." *Id.*  Thus, the denial of a stay-and-abeyance will be "effectively dispositive of the unexhausted claims."  *Id.*

The Court finds *Mitchell*'s rationale equally applicable in the context of Petitioner's motion to amend.  Although Petitioner was given the opportunity to file a renewed motion to amend, he ran the risk of having the original petition resolved prior to doing so.  If the Court dismissed the petition and Petitioner attempted to file a subsequent § 2254 petition raising the proposed amended claims, he would face the "onerous," *Mitchell*, 791 F.3d at 1172, procedural hurdles to filing second or successive habeas petitions.  Thus, even though the denial of Petitioner's motion to amend was "in form, without prejudice," *id.*, it has effectively foreclosed Petitioner from obtaining habeas relief on the proposed amended claims, *see id.* at 1172-74 (habeas petitioner's motion to stay and abey his habeas petition while he exhausted some of his claims in state court was dispositive as to his unexhausted claims, where choices available to petitioner were to either abandon his purportedly unexhausted claims or else face dismissal of his entire petition, effectively with prejudice, because of statute of limitations).

Accordingly, the Court concludes that the motion to amend was dispositive as to Petitioner's proposed amended claims.  The Court therefore will review the Decision and Order denying the motion to amend under a *de novo* standard.

**B.     Overview of the Motion to Amend and the Decision and Order**

The motion to amend purports to add a single "Ground Five" to the petition.  (Dkt. 18 at 1).   However, Petitioner lists multiple factual allegations under the heading for "Ground Five" and refers to two different legal theories.  More specifically, he alleges: (1) defense counsel failed to "file a second [motion for a] trial order of dismissal which effected [sic] the direct appeal"; (2) "appellate counsel did not address this issue as ineffective trial counsel in his brief for the direct appeal"; and (3) "both counsels" committed "numerous errors," including "failure to object."  (*Id.*).

The Magistrate Judge treated all of the foregoing allegations as one claim and found, without explanation, that it was untimely.  (Dkt. 22 at 4).  The Magistrate Judge also found, without explanation, that it did not relate back to the original petition and that it was unexhausted.  (*Id.*).

As this Court interprets the motion to amend, Petitioner seeks to add the following claims: defense counsel was ineffective for failing to renew the motion for a trial order of dismissal after presenting a case ("Proposed Claim 1"); appellate counsel was ineffective for failing to argue on direct appeal that defense counsel was ineffective due to his failure to renew the motion for a trial order of dismissal ("Proposed Claim 2"); defense counsel was ineffective for other, unnamed omissions, including unspecified failures to object ("Proposed Claim 3"); and appellate counsel was ineffective due to other unspecified shortcomings ("Proposed Claim 4").

### C.      Legal Principles Governing Amendment of § 2254 Petitions

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C.A. foll. § 2254, "permits application of the Federal Rules of Civil Procedure in habeas cases 'to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules.'"  *Mayle v. Felix*, 545 U.S. 644, 654-55 (2005) (citing Fed. R. Civ. P. 81(a)(2); 28 U.S.C. § 2242)); *see also Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001) ("Given that motions to amend are not successive habeas petitions, the standard for granting or denying a motion to amend is thus governed by Federal Rule of Civil Procedure 15(a).").

Federal Rule of Civil Procedure 15 ("Rule 15") governs amendment of pleadings in civil cases.  Once a responsive pleading has been served, the party seeking to amend must obtain consent of the opposing party or leave of court.  Fed. R. Civ. P. 15(a)(2).  Leave to amend "shall be freely given when justice so requires."  *Id.*  Nonetheless, leave may be denied where a court finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Murray v. Noeth,* No. 21CIV5343KMKJCM, 2022 WL 2116842, at *4 (S.D.N.Y. June 13, 2022) ("[L]eave to amend [a § 2254 petition] should be denied when the proposed new claim would be futile, either because it fails to comply with . . . [§ 2254(b)(1)'s] procedural requirements [for exhaustion of state remedies] or it lacks merit." (collecting cases)).

Where the applicable period of limitations has expired, the movant must demonstrate that the proposed "amendment . . . relates back to the date of the original pleading." Fed. R. Civ. P. 15(c)(1). An amendment "relates back" when, among other things, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

The Supreme Court has rejected a broad interpretation of Rule 15(c)(1)(B) in the context of § 2254 petitions, holding that proposed amended claims do not arise out of "the same conduct, transaction or occurrence" as claims in the original petition simply because the claims all challenge the same trial, conviction, or sentence. *Mayle*, 545 U.S. at 655-64. Instead, "relation back" of habeas claims is permitted "only when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." *Id.* at 657. "Relation back turns on the facts underlying a claim, not the legal theory." *Munoz v. Burge*, No. 02-CV-6198 NGG, 2010 WL 3394696, at *5 (E.D.N.Y. Aug. 20, 2010) (citing *Mayle*, 545 U.S. at 646 ("Decisions applying Rule 15(c)(2) in the civil context illustrate that Rule 15(c)(2) relaxes, but does not obliterate, the statute of limitations; hence relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims.")), *aff'd*, 442 F. App'x 602 (2d Cir. 2011).

- 26 -

**D.     Timeliness of the Motion to Amend**

In light of Rule 15(c)(1)'s "relation back" requirement, the Court's first task is to determine whether AEDPA's statute of limitations had expired at the time Petitioner filed the motion to amend.  Section 2254 petitions are subject to a one-year statute of limitations that begins to run upon the latest of four events:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The first question facing the Court is which event in subsections (A) through (D) of § 2244(d)(1) supplies the relevant start-date.  Because there will be a "judgment of conviction" in all criminal cases, subsection (A) of § 2244(d)(1) usually governs the commencement of the limitations period for § 2254 petitions.  *See Simmons v. United States*, 974 F.3d 791, 798 (6th Cir. 2020) (stating, in the context of habeas petition filed under 28 U.S.C. § 2255, that "the one-year period will, as a default, be triggered by Section 2255(f)(1)" since "[t]he 'judgment of conviction' referenced in Section 2255(f)(1) is the

only event mentioned in Section 2255(f) that will necessarily occur in every case"). There is no indication in the record of this case that a different start-date is appropriate.

For purposes of § 2244(d)(1)(A), a state conviction becomes "final" when the United States Supreme Court denies an application for a writ of certiorari or when the time to seek certiorari has expired, which is 90 days following the date on which direct review by the state's highest court is complete. *See Gonzalez v. Thaler*, 565 U.S. 134, 140 (2012) ("For petitioners who pursue direct review all the way to this Court, the judgment becomes final at the 'conclusion of direct review'—when this Court affirms a conviction on the merits or denies a petition for certiorari. For all other petitioners, the judgment becomes final at the 'expiration of the time for seeking such review'—when the time for pursuing direct review in this Court, or in state court, expires."); U.S. Sup. Ct. R. 13(1).

The New York Court of Appeals denied Petitioner's application for leave to appeal on July 18, 2018. (SR: 443). Petitioner did not seek a writ of certiorari from the Supreme Court, so the judgment of conviction became final 90 days later, on October 16, 2018. Petitioner had one year from that date in which to file the instant § 2254 petition.

Pursuant to the prison mailbox rule, "a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials." *Hardy v. Conway*, 162 F. App'x 61, 62 (2d Cir. 2006) (collecting cases). As there is nothing in the docket to indicate when Petitioner handed his petition over to prison officials for mailing, the Court finds that the petition was filed on March 18, 2020, the date on which Petitioner signed it. (Dkt. 1 at 9); *see Corrigan v. Barbery*, 371 F. Supp. 2d 325, 328 n.4 (W.D.N.Y. 2005).

Although the petition was filed just over five months years after the limitations period expired on October 16, 2019, the Court finds that the petition is timely under § 2244(d)(1)(A) because Petitioner's post-judgment collateral attacks on his conviction provide sufficient statutory tolling under § 2244(d)(2).  Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation."  28 U.S.C. § 2244(d)(2).

The Second Circuit applies the prison mailbox rule to determine the date on which an application for post-conviction or other collateral review is "properly filed" for purposes of § 2244(d)(2).  *Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005); *see also id.* at 114 (petitioner's state *coram nobis* motion was "properly filed" on the date he delivered it to prison authorities for mailing).  "A state court application or motion for collateral relief is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures."  *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000); *see also Carey v. Saffold*, 536 U.S. 214, 217, 221 (2002) (approving Second Circuit's definition of "pending").  "[S]tatutory tolling for the purposes of AEDPA ends with the 'filing' of the state court's final order," *Saunders v. Senkowski*, 587 F.3d 543, 549 (2d Cir. 2009), not the date on which the petitioner "received notice of the state court's order," *id.*

As noted above, Petitioner filed two C.P.L. § 440.10 motions and one *coram nobis* motion.  The Court considers them in turn below.

Petitioner's first C.P.L. § 440.10 motion was filed on February 1, 2017.  (SR: 1).  It ceased to be pending on January 10, 2018, when the Appellate Division denied leave to appeal.  (SR: 135); *see Collins v. Artus*, 496 F. Supp. 2d 305, 312 (S.D.N .Y. 2007) ("In the case of a motion to vacate a conviction under C.P.L. § 440.10, the statute of limitations is tolled from the date the motion is filed to the date it is decided by the trial court, as well as during the pendency of an application for leave to appeal from the trial court's denial of that motion."); *Evans v. Senkowski*, 228 F. Supp. 2d 254, 262 (E.D.N.Y. 2002) (holding that the statute of limitations was tolled "from the filing of the First Section 440 Motion until the denial of appeal by the Appellate Division" (citing *Gomez v. Duncan*, No. 02CIV0846LAPAJP, 2002 WL 1424584 *3 (S.D.N.Y. July 1, 2002); *Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000), *superseded by statute on other grounds as stated in Saunders v. Senkowski*, 587 F.3d 543, 549 (2d Cir. 2009)).  As the statute of limitations did not commence until October 16, 2018, the pendency of the first C.P.L. § 440.10 motion did not contribute to any statutory tolling.

Petitioner filed the second C.P.L. § 440.10 motion on November 7, 2018.  (SR: 444). By the time it was filed, 22 days had elapsed on the limitations period.  The second C.P.L. § 440.10 motion was denied by the trial court on April 26, 2019.  (SR: 494).  "However, the C.P.L. § 440.10 motion did not cease to be pending on that date, because [P]etitioner still was entitled to seek discretionary leave to appeal the denial of that motion, and indeed was required to do so in order to exhaust any of the claims raised therein."  *Vincent v. Lape*, No. 07-CV-6007L, 2007 WL 4224198, at *3 (W.D.N.Y. Nov. 26, 2007) (footnote omitted). Under C.P.L. § 460.10(4), "[a]n appeal by a defendant to an intermediate appellate court

by permission, pursuant to [C.P.L. §]450.15, is taken" by applying for a certificate for leave "[w]ithin thirty days after service upon the defendant of a copy of the order sought to be appealed . . . ." N.Y. Crim. Proc. Law § 460.14(a). There is no indication in the state court records that Petitioner filed an application for leave to appeal to the Appellate Division. Therefore, the second C.P.L. § 440.10 motion ceased to be pending on May 28, 2019,[9] when the 30-day period for seeking leave to appeal to the Appellate Division expired. *See Vincent*, 2007 WL 4224198, at *3.

The limitations period ran for another 53 days, until Petitioner filed the *coram nobis* motion on July 20, 2019. (SR: 499). The *coram nobis* motion ceased to be pending on December 31, 2019, when the New York Court of Appeals denied leave to appeal the Appellate Division's denial of relief. (SR: 542); *see Clemente v. Lee*, 72 F.4th 466, 477 (2d Cir. 2023).

The limitations period then ran for 78 days, until the petition was filed on March 18, 2020. At the time the petition was filed, only 153 days of the limitations period had elapsed, leaving 212 days remaining. Therefore, the petition was timely.

---

[9]     Thirty days after April 26, 2019, fell on Sunday, May 26, 2019, and was followed by a federal holiday on Monday, May 27, 2019. Where, as here, a period is measured in days or longer units, the Court must "count every day, including intermediate Saturdays, Sundays, and legal holidays," Fed. R. Civ. P. 6(a)(1)(B), and must "include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday," Fed. R. Civ. P. 6(a)(1)(C); *see Mickens v. United States*, 148 F.3d 145, 148 (2d Cir. 1998) (applying Federal Rule of Civil Procedure 6 to calculations involving AEDPA's analogous one-year limitations period for habeas petitions filed by federal prisoners under 28 U.S.C. § 2255).

The statute of limitations continued to run because, after the *coram nobis* motion ceased to be pending, Petitioner filed no additional applications that could have provided tolling under § 2244(d)(2).  In addition, the pendency of this habeas petition did not provide statutory tolling.  *See Duncan v. Walker*, 533 U.S. 167, 181-82 (2001) (holding that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)").

Petitioner filed his motion to amend on December 8, 2020, which was 265 days after the petition was filed.  As there were only 212 days remaining on the limitations period at the time the petition was filed, the motion to amend was untimely by 53 days.  Therefore, the proposed new claims are untimely under § 2244(d)(1)(A).  The record contains no facts suggesting that it would be appropriate to employ one of the later start-dates found in subsections (B), (C), and (D) of § 2244(d)(1).  The Court turns to the question of whether any of the proposed new claims relate back to the originally pleaded claims.

### E. Proposed Claim 2 Relates Back

In Proposed Claim 2, Petitioner contends that appellate counsel was ineffective for failing to argue that defense counsel was ineffective for failing to preserve the legal sufficiency claim by renewing the motion for a trial order of dismissal at the close of the defense case.  (Dkt. 18 at 1).  Ground Three of the petition asserts that the evidence was not legally sufficient to satisfy due process.  (Dkt. 1 at 7).  The alleged ineffectiveness of appellate counsel asserted in Proposed Claim 2 "arise[s] out of . . . , and [is] made in connection with," *Page v. Walsh*, No. 10 CIV 5264 DAB KNF, 2011 WL 134975, at *3 (S.D.N.Y. Jan. 7, 2011), the challenge to the legal sufficiency of the evidence asserted in

Ground Three.  In other words, the facts underlying Proposed Claim 2 are not different in time and type from the legal sufficiency claim originally asserted in Ground Three.  *See Nickels v. Conway*, No. 10-CV-0413 MAT, 2013 WL 4403922, at *3 (W.D.N.Y. Aug. 15, 2013) ("The claim that Appellate Counsel was ineffective in failing to argue that Trial Counsel was ineffective in failing to preserve the legal insufficiency claim adds a new legal theory, connected to the same operative facts as those already asserted—namely, that the evidence was legally insufficient to support Petitioner's conviction for depraved indifference murder because the prosecution failed to adduce evidence of the requisite recklessness and indifference to human life.").  Proposed Claim 2 thus relates back to the timely-filed petition.  *See id.*; *see also Page*, 2011 WL 134975, at *3.

Proposed Claim 2 also is fully exhausted because Petitioner raised it in federal constitutional terms using the proper procedural vehicle in state court.  *See Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) ("[A] petitioner cannot show exhaustion unless he has 'fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts.'" (quoting *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981)); *see also id.* ("In a criminal action, the writ of error *coram nobis* lies in only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel." (alteration in original, quotation and citation omitted)).  Petitioner then sought leave to appeal the Appellate Division's adverse decision to the New York Court of Appeals.  *See Brooks v. Sticht*, No. 20-CV-1108 (JLS), 2022 WL 1190456, at *13 n.7 (W.D.N.Y. Apr. 21, 2022) ("[T]o fully exhaust *coram nobis* claims, a petitioner must pursue an application for leave to appeal to the New York Court of Appeals

from the Appellate Division's denial of a *coram nobis* application." (collecting cases)). Because Proposed Claim 2 is fully exhausted and satisfies the relation back requirement, amendment would not be futile. Accordingly, the motion to amend is granted to the extent that the petition is amended to include Proposed Claim 2.

### F.    Amendment Would Be Futile as to the Remaining Proposed Claims

#### 1.    Proposed Claim 1

Proposed Claim 1 asserting that defense counsel was ineffective for failing to preserve Petitioner's claim that the evidence was legally insufficient relates back to the legal sufficiency claim based on the same rationale that applies to Proposed Claim 2. Nevertheless, amendment would be futile because Proposed Claim 1 is unexhausted.

Although Petitioner presented the claim in his second C.P.L. § 440.10 motion, he did not seek leave to appeal the trial court's denial of that motion. Therefore, he failed to "invoke[e] one complete round of [New York] State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), and did not fulfill the exhaustion requirement as to Proposed Claim 2, *see*, *e.g.*, *Lewis v. Dufrain*, 392 F. Supp. 2d 498, 503 (W.D.N.Y. 2005) (finding that claims alleging subornation of testimony and ineffective assistance of trial counsel, both of which initially were raised in two C.P.L. § 440.10 motions, were not exhausted because the petitioner failed to request leave to appeal the denial of those motions).

Proposed Claim 1 remains unexhausted because Petitioner has available remedies in state court. There is no time limit on filing C.P.L. § 440.10 motions. *See* N.Y. Crim. Proc. Law § 440.10(1) (stating that a motion to vacate may be made "[a]t any time after

the entry of a judgment").  Although Proposed Claim 1 is based on an error by defense counsel that is apparent on the trial record, Petitioner would not face mandatory dismissal of the claim in light of the 2021 amendments to C.P.L. § 440.10.  *Chase v. Russell*, No. 119CV00617EAWLGF, 2024 WL 1739708, at *15 (W.D.N.Y. Apr. 23, 2024) (citing *People v. Green*, 201 A.D.3d 814, 816 (2d Dep't 2022) ("[E]ffective October 25, 2021, CPL 440.10(2)(c) does not apply to the issue of ineffective assistance of counsel."); other citations omitted).

Moreover, while C.P.L. § 440.10(3)(c) allows a court to deny a claim that could have been raised in a defendant's previous C.P.L. § 440.10 motion, "there is no absolute rule . . . barring successive C.P.L. § 440.10 motions [asserting the same claims]."  *Brewer v. Eckert*, No. 19-CV-6486-FPG, 2020 WL 10061923, at *4 (W.D.N.Y. Sept. 10, 2020) (citing *Borcyk v. Lempke*, 727 F. Supp. 2d 189, 192 (W.D.N.Y. 2010) ("[D]enials [under C.P.L. § 440.10(3)(c)] are discretionary and do not impose an absolute bar on successive motions." (quoting *Bonilla v. Portuondo*, No. 00CIV.2369(JGK)9JCF), 2004 WL 350694, at *15 (S.D.N.Y. Feb. 26, 2004), *adopted*, No. 00 CIV. 2369 (JGK), 2004 WL 1782174 (S.D.N.Y. Aug. 9, 2004); citations omitted)).  Because Petitioner still has an available avenue to return to state court to exhaust his ineffective assistance claim in Proposed Claim 1, it cannot be deemed exhausted.  *See* 28 U.S.C. § 2254(c).

"Allowing a petitioner to amend his habeas petition to include an unexhausted claim 'would . . . be futile if the court also declined to use the stay and abeyance procedure while the petitioner exhausts the claim in state court."  *Tineo-Santos v. Piccolo*, No. 19CV5038MKVJLC, 2021 WL 266561, at *2 (S.D.N.Y. Jan. 27, 2021) (quoting *Spells v.*

*Lee*, No. 11-CV-1680 (KAM) (JMA), 2012 WL 3027865, at *5 (E.D.N.Y. July 23, 2012) (citation omitted)).  Notably, Petitioner has never sought a stay to exhaust Proposed Claim 1.  Allowing him the opportunity to do so at this late juncture would be an abuse of discretion in light of the Supreme Court's direction in *Rhines* that a stay is "only" appropriate if there is "good cause for the petitioner's failure to exhaust his claims first in state court," 544 U.S. at 277, and the claims are not "plainly meritless," *id.*

Petitioner cannot demonstrate "good cause" for failing to complete exhaustion proceedings with regard to Proposed Claim 1 given that he had filed an earlier C.P.L. § 440.10 motion and sought leave to appeal after it was denied.  Thus, Petitioner clearly was aware of the steps necessary to complete exhaustion proceedings in the context of C.P.L. § 440.10 motions.  "The absence of 'good cause' for the failure to exhaust is fatal to Petitioner's ability to fulfill the *Rhines* standard." *Carr v. Graham*, 27 F. Supp. 3d 363, 365 (W.D.N.Y. 2014) (citing *Rhines*, 544 U.S. at 277).  Accordingly, the Court denies with prejudice, as futile, the motion to amend to the extent it seeks to add Proposed Claim 1.

## 2.    Proposed Claims 3 and 4

Proposed Claims 3 and 4 do not identify any specific errors by defense counsel or appellate counsel.  It is well settled that, as a general matter, "[f]ederal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation." *Mills v. Lempke*, No. 11-CV-0440 MAT, 2013 WL 435477, at *23 (W.D.N.Y. Feb. 4, 2013) (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support"); other citations omitted).

To satisfy the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), for Sixth Amendment ineffectiveness claims, the petitioner must show that counsel made errors that were objectively unreasonable and resulted in prejudice to the defense. *Id.* at 687. The petition "must contain specific factual contentions regarding *how* counsel was ineffective." *Peart v. Royce*, No. 9:17-CV-01187-JKS, 2019 WL 3454076, at *9 (N.D.N.Y. July 31, 2019) (emphasis supplied) (citing *Hall v. Phillips*, No. 1:04-CV-1514, 2007 WL 2156656, at *13 (E.D.N.Y. July 25, 2007) ("The petition suffers from an additional flaw . . . [in that] it fails to tie the ineffective assistance claim to any factual allegations . . . demonstrat[ing] how counsel was ineffective. The absence of such allegations is fatal to an ineffective assistance claim on habeas."); other citations omitted)).

Apart from the ineffectiveness allegations referenced in Proposed Claims 1 and 2, there are no other specific ineffectiveness claims in Petitioner's first C.P.L. § 440.10 motion or *coram nobis* motion that the Court could assume Petitioner was trying to raise in Proposed Claims 3 and 4. Because Proposed Claims 3 and 4 are too vague to state colorable grounds for habeas relief, it would be futile to permit amendment to include them in the petition. To the extent that the motion to amend seeks permission to add Proposed Claims 3 and 4, it is denied with prejudice as futile.

## V.   <u>STANDARD OF REVIEW</u>

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by [AEDPA] . . . ." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under 28 U.S.C. § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim

that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." *Id.* § 2254(e)(1).

Even where a habeas petitioner "surmount[s] 2254(d)'s bar to habeas relief," *Wiggins v. Smith*, 539 U.S. 510, 542 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 393-94, 397 (2000)), the federal court must review the claim *de novo* under the correct federal standard, *see id.* In other words, AEDPA "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it." *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Thus, in addition to satisfying the limitations in § 2254(d), "the petitioner still 'bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated.'" *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (quoting *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012)).

## VI.   <u>DISCUSSION</u>

### A.   **Actual Innocence (Ground One)**

In Ground One of the petition, Petitioner purports to assert a freestanding claim of actual innocence. (Dkt. 1 at 6). Petitioner argues that he could not have committed petit larceny because he had a "good faith basis for an ownership interest in the dogs despite the fact they were licensed in [Woodburn]'s name," and that Woodburn "conceded that she

was a 'Joint Owner' of the dogs inasmuch as she testified that she considered the dogs to be owned by both her and [Petitioner]."  (*Id.*).  Petitioner contends that he could not have committed second-degree burglary because he and Woodburn had "an unwritten rule where the window was 'sort of like an entrance that could be used when the doors were locked,'" and that rule had not been revoked.  (*Id.*).  Thus, Petitioner reasons that his entry was lawful.  (*Id.*).

As Respondent observes, this claim is essentially identical to the weight of the evidence claim Petitioner asserted in his counseled appellate brief on direct appeal.  (*Compare id. with* SR: 150-57).  Respondent argues that whether the allegations in Ground One are construed as a freestanding actual innocence claim or a weight of the evidence claim, they do not assert a cognizable constitutional claim.  (Dkt. 10 at 22-24).  The Court agrees.

### 1.     Actual Innocence

The Supreme Court has determined that a federal habeas petitioner may assert a "gateway" claim of actual innocence to overcome the procedural default of a constitutional claim or to equitably toll the statute of limitations applicable to habeas petitions. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  However, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.  *Id.* at 392; *see also Jimenez v. Stanford*, 96 F.4th 164, 183 (2d Cir. 2024) ("To this day, '[w]hether . . . a federal right [based on a claim of actual innocence] exists is an open question.'" (ellipsis and alterations in original) (quoting *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009)).

Assuming for the sake of argument that a freestanding actual innocence claim is cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested that the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), applicable to gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in *Herrera*[*v. Collins*, 506 U.S. 390, 416-17 (1993),] and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

The Second Circuit recently held that "[e]ven assuming that a freestanding innocence claim is cognizable, . . . a freestanding innocence claim requires a higher standard of proof than the certainty required to establish gateway innocence." *Jimenez*, 96 F.4th at 183. To establish a gateway claim of actual innocence, a habeas petitioner "must make a 'sufficiently credible and compelling' claim of innocence." *Id.* at 185 (quoting *Hyman v. Brown*, 927 F.3d 639, 657 (2d Cir. 2019)). "For the [innocence] claim to be 'credible,' it must be supported by 'new reliable evidence . . . that was not presented at trial.'" *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) (quoting *Schlup*, 513 U.S. at 324). "A compelling innocence claim must demonstrate that, 'more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt.'" *Jimenez*, 96 F.4th at 185 (alteration in original) (quoting *House*, 547 U.S. at 538). Satisfying the prerequisites for a gateway actual innocence claim "is no nominal demand." *Id.*

Here, Petitioner simply repeats the arguments he raised on direct appeal in support of his contentions that the second-degree burglary and petit larceny verdicts were against the weight of the evidence and were not supported by legally sufficient evidence of intent to commit a crime.  (*Compare* Dkt. 1 at 6 *with* SR: 150-57).  "It is well established that '"actual innocence" means factual innocence, not mere legal insufficiency.'"  *Blocker v. Graham*, No. 6:17-CV-06648-CJS, 2022 WL 309952, at *18 (W.D.N.Y. Feb. 2, 2022) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)).  As Petitioner's allegations do not come close to meeting the "'demanding and rarely met' [gateway] standard," *Jimenez*, 96 F.4th at 185 (quoting *Hyman*, 927 F.3d at 655), he necessarily cannot meet the even more demanding, hypothetical standard that a freestanding actual innocence claim would entail.  Therefore, the freestanding actual innocence claim is dismissed as noncognizable and, in any event, meritless.

## 2.    Weight of the Evidence

"A challenge to a verdict based on the weight of the evidence differs from one based on the sufficiency of the evidence."  *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 332 (W.D.N.Y. 2011).  A "weight of the evidence" claim is grounded in a statutory provision, C.P.L. § 470.15(5), granting intermediate appellate courts in New York State broad factual review power.  *See People v. Bleakley*, 69 N.Y.2d 490, 495 (1987).  A legal insufficiency claim, on the other hand, is based on due process principles.  *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979) ("[A]s an essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction

except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.").

The Second Circuit has recognized that "the argument that a verdict is against the weight of the evidence states a claim under state law." *McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011). As it is well settled that "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), courts in this Circuit consistently have dismissed, as not cognizable, claims by habeas petitioners asserting their verdicts were against the weight of the evidence. *See McKinnon*, 422 F. App'x at 75 (collecting cases). Because Petitioner's challenge to the weight of the evidence presents nothing more than an issue of state statutory law, it is dismissed as not cognizable on federal habeas review.

### B.    Prosecutorial Misconduct (Grounds Two and Four)

Petitioner alleges that the prosecutor coerced Woodburn into providing false testimony incriminating him and tampered with the body camera video footage. (Dkt. 1 at 7). Respondent argues that these allegations are procedurally defaulted under the adequate and independent state ground doctrine because, on direct appeal, the Appellate Division rejected them as unpreserved by a timely objection and, in any event, without merit. (Dkt. 10 at 10-11).

Respondent also argues that the prosecutorial misconduct claims are unexhausted but must be deemed exhausted and procedurally defaulted. (*Id.* at 11-13). Respondent notes that Petitioner asserted the prosecutorial misconduct claims in his *pro se* supplemental brief filed in the Appellate Division, but appellate counsel did not include

them in the letter seeking leave to appeal to the New York Court of Appeals.  (*Id.* at 11).

Respondent contends that Petitioner no longer has remedies available in state court because

he has used the one direct appeal to which he was entitled and, if he raised them again in a

third 440 motion, the trial court again would reject them on the basis of C.P.L.

§ 440.10(2)(b), as it did in the order denying the first 440 motion.  (*Id.* at 12).

However, Respondent does not argue that the prosecutorial misconduct claims are

procedurally defaulted under the adequate and independent state ground doctrine because

the trial court actually relied on C.P.L. § 440.10(2)(b) to reject them in the first 440 motion.

Nor does Respondent address why Petitioner did not fulfill the exhaustion requirement as

to the prosecutorial misconduct claims, given that he also raised them in the first 440

motion in constitutional terms and then sought leave to appeal the denial of that motion to

the Appellate Division.

"[I]n habeas corpus cases, potentially complex and difficult issues about the various

obstacles to reaching the merits should not be allowed to obscure the fact that the

underlying claims are totally without merit."  *Quinney v. Conway*, 784 F. Supp. 2d 247,

260 (W.D.N.Y. 2011) (alteration in original) (quoting *Boddie v. New York State Div. of

Parole*, 288 F. Supp. 2d 431, 439 (S.D.N.Y. 2003); citing *Lambrix v. Singletary*, 520 U.S.

518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas

petition is justified in rare situations, "for example, if the [underlying issues] are easily

resolvable against the habeas petitioner, whereas the procedural bar issue involved

complicated issues of state law")).

Because Petitioner's allegations of prosecutorial misconduct are easily rejected as meritless, judicial efficiency favors bypassing the threshold procedural issues and proceeding directly to the merits.  In addition, the Court need not determine whether the trial court or the Appellate Division adjudicated Petitioner's prosecutorial misconduct claims on the merits for purposes of 28 U.S.C. § 2254(d) because even under a *de novo* standard of review, they do not warrant habeas relief.  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").

### 1.    Coercion of False Testimony from Woodburn

The use of perjured testimony can violate a defendant's due process rights, but only where "'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted in original)).  That the "witness actually committed perjury" is a necessary predicate for a due process claim.  *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (holding that "appellants' claim fail[ed] because they have not established that [the witness] committed perjury").

Petitioner's due process claim falters on this requirement.  As Respondent argues (Dkt. 10 at 15), and the trial court found when it denied the first 440 motion (SR: 117), Woodburn never said in her affidavit that the prosecutor coerced her to testify falsely.

Although Woodburn stated she was pressured to say "what [the prosecutor] wanted [her] to say" (SR: 12), she did not assert that the prosecutor wanted her to say anything that was false or untrue.

Moreover, as the trial court noted, Woodburn's affidavit failed to identify any specific portion of her testimony that was false. (SR: 117). Thus, as the trial court observed, Woodburn's affidavit did not directly contradict her testimony. (*Id.*). Even if it had, federal courts consistently have held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995).

In any event, the record demonstrates that to the extent Woodburn revised her testimony after purportedly meeting with the prosecutor, she only did so after being confronted with her grand jury testimony; her sworn statement to the police following the August 31, 2015 incident; and the recording of her 911 call. (T: 132-53). When faced with these prior statements, Woodburn stated unequivocally that she did not give Petitioner permission to enter the house that day or to take the dogs. (T: 190-91, 193-95). In fact, she specifically denied telling him that he could enter the house through the window. (T: 139-40).

Petitioner's accusations against the prosecutor of coercing false testimony from Woodburn are factually unsubstantiated and contradicted by the trial record. Petitioner therefore has not established that a due process violation occurred at his trial. Accordingly, this claim does not provide a basis for habeas relief.

### 2.    Tampering With the Body Camera Footage

Petitioner's claim that the prosecutor tampered with the body camera footage is based solely on his unsworn, self-serving, and unsubstantiated allegations.  (SR: 232-39).  The only "discrepancies" about which he allegedly complained to his defense attorney prior to trial were that the "first tazing" incident was "[m]issing," and there was an "audio portion that [he] never heard."  (SR: 235).  None of the rambling allegations in his unsworn statement (SR: 232-39) have any relevance to the claims raised in this petition.

It is well settled that "[f]ederal courts 'have no obligation to entertain pure speculation and conjecture.'"  *Scott v. Racette*, No. 1:15-CV-00043-MAT, 2018 WL 451825, at *15 (W.D.N.Y. Jan. 17, 2018) (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011)); *see also Wood*, 516 U.S. at 8 (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support").  The speculative nature of Petitioner's allegations, standing alone, is a sufficient basis for rejecting his claim of evidence-tampering claim.  *See Scott*, 2018 WL 451825, at *15 (rejecting the habeas petitioner's "claims of pervasive misconduct by multiple law enforcement agencies, amounting to no less than a conspiracy to unjustly incarcerate him," because they were "based upon rank speculation with no record support") (collecting cases).  This aspect of Petitioner's prosecutorial misconduct claim is factually unsubstantiated and does not provide a basis for habeas relief.

### C.    Legal Sufficiency of the Evidence (Ground Three)

Petitioner asserts, as he did on direct appeal, that the prosecution did not present legally sufficient evidence of intent for purposes of proving his guilt beyond a reasonable

doubt of petit larceny and second-degree burglary. (Dkt. 1 at 7). Petitioner argues that the prosecution failed to adduce proof of intent to commit a crime inside Woodburn's dwelling. (*Id.*). According to Petitioner, the proof instead showed that he "was just going to pick up his jointly owned dogs," as Woodburn had "asked him to do, which he was doing daily, taking them to the park for her;" and that Woodburn "never informed [him] he could not pick up the dogs that day." (*Id.*).

Respondent argues that the legal sufficiency claims are procedurally defaulted from habeas review because the Appellate Division rejected them based on an adequate and independent state ground—defense counsel's failure to preserve the claim by renewing his motion for a trial order of dismissal after presenting an affirmative case. (Dkt. 10 at 17). In his reply (Dkt. 11), Petitioner did not acknowledge Respondent's procedural default argument regarding this claim.

Respondent's assertion of procedural default presents a potentially complicated issue of state law while Petitioner's legal sufficiency claim is easily resolved against him. For this reason, judicial efficiency favors bypassing the threshold procedural issues and proceeding directly to the merits. *See Lambrix*, 520 U.S. at 523.

The Supreme Court has held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Evidence is legally sufficient to satisfy due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319

(emphasis in original). If the trial record "supports conflicting inferences," the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 319). "[T]he only question under *Jackson* is whether [the factfinder's] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

Where the state court has adjudicated a legal sufficiency claim on the merits, the habeas court must apply a layer of deference in addition to that imposed by *Jackson* itself. *Id.* at 651. The habeas court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). Instead, the federal habeas court "may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos*, 565 U.S. at 2 (quoting *Renico v. Lett*, 599 U.S. 766, 773 (2010)).

Here, as noted above, the Appellate Division found that the legal sufficiency claim was unpreserved, but stated that it necessarily reviewed the sufficiency of the evidence as part of its review of the weight of the evidence. *Miller*, 159 A.D.3d at 1609; *see generally People v. Danielson,* 9 N.Y.3d 342, 349 (2007) ("A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof. A legally sufficient verdict can be against the weight of the evidence."). The Appellate Division majority provided a lengthy summary of the trial evidence, in which it clearly

viewed the evidence in the light most favorable to the prosecution and resolved conflicting evidentiary inferences in the prosecution's favor. *See id.* at 1609-10.

On the other hand, it did not explicitly state, in so many words, that the evidence was legally sufficient to prove Petitioner's guilt beyond a reasonable doubt; nor did it cite the standard for evaluating legal sufficiency claims, which is identical under state and federal law. *See People v. Contes*, 60 N.Y.2d 620, 621 (1983) (applying the *Jackson* standard). However, the Supreme Court "has observed . . . [that] a state court need not cite or even be aware of [its] cases under § 2254(d)" for a state court's decision to constitute an "adjudication" for purposes of § 2254(d). *Harrington*, 562 U.S. at 98 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)). Ultimately, the Court need not determine whether the Appellate Division adjudicated Petitioner's legal sufficiency claim on the merits for purposes of 28 U.S.C. § 2254(d) because even under a *de novo* standard of review, the claim does not warrant habeas relief. *See Thompkins*, 560 U.S. at 390.

Analysis of a legal sufficiency claim begins with identifying the substantive elements of Petitioner's crimes of conviction. *See Jackson*, 443 U.S. at 324 n.16. "A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when: . . . [t]he building is a dwelling." N.Y. Penal Law § 140.25(2). Here, the prosecution alleged that the crime Petitioner intended to commit inside a dwelling was petit larceny.

"A person is guilty of petit larceny when he steals property." N.Y. Penal Law § 155.25. "Larceny is committed when one wrongfully takes, obtains or withholds 'property from an owner thereof' with intent to deprive the owner of it, or appropriate it to

oneself or another." *People v. Zinke*, 76 N.Y.2d 8, 10 (1990) (quoting N.Y. Penal Law § 155.05(1)). "Owner" is defined as one "who has a right to possession [of the property taken] superior to that of the taker, obtainer or withholder." N.Y. Penal Law § 155.00(5). However, "[a] joint or common owner of property shall not be deemed to have a right of possession thereto superior to that of any other joint or common owner thereof." *Id*.

"In a prosecution for larceny by trespassory taking, it is a defense 'that the property was appropriated under a claim of right made in good faith.'" *People v. Michaels*, 132 A.D.3d 1073, 1075 (3d Dep't 2015) (quoting N.Y. Penal Law § 155.15(1)). "A good-faith claim of right negates larcenous intent, and the [prosecution] [has] the burden of disproving such defense beyond a reasonable doubt." *Id.* (citing *People v. Zona*, 14 N.Y.3d 488, 492-93 (2010)).

Thus, the prosecution was required to prove beyond a reasonable doubt that: (1) Petitioner was not a joint owner of the dogs with Woodburn; (2) Petitioner's entry into Woodburn's dwelling was unlawful; (3) Petitioner had larcenous intent insofar as he intended to deprive the sole owner, Woodburn, of the dogs; and (4) Petitioner did not have a good faith claim of right to the dogs.

With regard to Woodburn's sole ownership of the dogs and Petitioner's lack of a good faith claim of right to them, Woodburn testified that Petitioner "would contact her for permission to visit the dogs" after he moved out of her house. *Miller*, 159 A.D.3d at 1609; (*see also* T: 119-20)*.* On the morning of the incident, Petitioner called Woodburn *"*and asked if he could come get the dogs, but [she] already had plans to take the dogs with her on an outing and she told [him] that he could not visit the dogs that day." *Id.*; (*see also* T:

121-22, 124, 148-49, 161-62, 190-91).  Petitioner makes much of Woodburn's conflicting testimony on the joint-ownership issue.  As noted above, Woodburn testified on direct examination that the dogs belonged solely to her (T: 116), but equivocated on cross-examination, answering "yes" when asked if she and Petitioner had joint custody of the dogs (T: 164-65, 180).  It is well settled that "the [factfinder] is free to believe part and disbelieve part of any witness's testimony."  *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009).

With regard to Petitioner's unlawful entry into Woodburn's dwelling, the Appellate Division majority cited Woodburn's testimony that Petitioner "had moved out of the residence three months earlier."  *Id.*; (*see also* T: 68-69, 118-19).  In addition, Woodburn's neighbor, Albano, testified when Petitioner arrived at the residence, he "begin to bang on [Woodburn]'s door."  *Id.*; (*see also* T: 72, 77-78).  When Woodburn did not answer, Albano saw Petitioner "open[] a window on [Woodburn]'s porch and climb[] through the window into [her] house."  *Id.*; (*see also* T: 72, 78-79).  As the majority correctly observed, the trial testimony undermined the dissent's "view that there is no dispute that the record establishes that [Petitioner] commonly used the window to enter [Woodburn]'s home with her consent to gain access to the dogs."  *Id.*  Instead, Woodburn had testified that Petitioner "'[m]aybe once' had gone through the porch window."  *Id.* (alteration in original; citation to record omitted in original); (*see also* T: 176).  In addition, as the majority noted, Woodburn testified "she did not give him permission to enter her home through the window" on the morning of August 31, 2015.  *Id.*; (*see also* T: 139-40, 193-94).

Once inside Woodburn's home, Petitioner "went upstairs to [Woodburn]'s bedroom and forced his way through her locked door." *Id.*; (*see also* T: 142-47).  When Woodburn "told [him] to leave, . . . he began to take the dogs." *Id.*; (*see also* T: 147-48).  Woodburn called 911 and "frantically reported to the 911 operator that she needed help 'immediately' because [Petitioner] broke into her house through a window, 'busted' through her door, and tried to steal her dogs." *Id.* at 1609-10 (citation to record omitted in original); (*see also* T: 149-52).  Woodburn also "told the operator that she was afraid he was going to kill her." *Id.*; (*see also* T: 149-52).  On the recording of the 911 call, Woodburn "could be heard yelling 'Leave . . . Leave!' and screaming 'Get out of here!'" *Id.* at 1609 (ellipsis in original (citation to record omitted in original)); (*see also* T: 149-52).  Albano "heard [Woodburn] yelling and observed her pushing [Petitioner] out the door." *Id.* at 1610; (*see also* T: 72-73).

As to Petitioner's larcenous intent and lack of a good faith claim of right to the dogs, the majority noted that Wright's "body camera footage from the morning of the crime shows that [Petitioner] repeatedly told the police that his ex-wife stole his dogs and his money, and that he wanted 'one of them.'" *Id.* (citation to record omitted in original).  The majority noted that in addition, "[a]lthough defendant also claimed to have paperwork proving that the dogs were licensed to him, the evidence at trial established that the dogs were licensed to the complainant." *Id.*; (*see also* T: 116, 163-64).

On the record developed at trial, a rational factfinder reasonably could have found that the prosecution satisfied its burden of proving beyond a reasonable doubt that: (1) Petitioner was not a joint owner of the dogs with Woodburn; (2) Petitioner's entry into

Woodburn's dwelling was unlawful; (3) Petitioner had larcenous intent insofar as he intended to deprive the sole owner, Woodburn, of the dogs; and (4) Petitioner did not have a good faith claim of right to the dogs.

Petitioner's arguments to the contrary essentially require the factfinder to credit his testimony over Woodburn's and to draw all reasonable evidentiary inferences in favor of the defense. Defense counsel made these arguments during his summation but the trial court, as evidenced by its guilty verdict on the second-degree burglary and petit larceny charges, apparently rejected them. It is well settled that the trial court, sitting as factfinder in this nonjury case, was exclusively responsible for resolving conflicts in the witnesses' testimony, weighing the evidence, and drawing "reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Neither on direct appeal nor on federal habeas is a court reviewing a sufficiency of the evidence claim permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity." *Moye v. Corcoran*, 668 F. Supp. 2d 523, 539 (W.D.N.Y. 2009) (citing *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1983); *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981)).

Petitioner has not demonstrated that the trial court's factual findings were "so insupportable as to fall below the threshold of bare rationality," which is all that *Jackson* requires. *Coleman*, 566 U.S. at 656. Accordingly, his legal sufficiency claim fails even under a *de novo* standard, without applying the additional layer of deference imposed by § 2254(d).

### D.     Ineffective Assistance of Appellate Counsel (Proposed Claim 2)

Petitioner asserts that appellate counsel was ineffective for failing to argue on direct appeal that defense counsel was ineffective for failing to properly preserve the claims that the evidence was legally insufficient to support the convictions for petit larceny and second-degree burglary.   (Dkt. 18 at 1).   The Court need not determine whether the Appellate Division adjudicated this claim on the merits in connection with the *coram nobis* motion because even under a *de novo* standard, it fails.

Although originally enunciated in a case concerning the ineffectiveness of trial counsel, "*Strickland*'s two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right."   *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)).   With regard to the performance prong, the Supreme Court has stated that appellate attorneys "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."   *Smith v. Robbins*, 528 U.S. 259, 288 (2000).   "To establish prejudice in the appellate context, a petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court."   *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015).

It is evident from appellate counsel's opening brief, reply brief, and leave application that he made a well-considered, strategic decision to argue that defense counsel *had* preserved the legal sufficiency claim by essentially making a motion for a trial order of dismissal at the very beginning of his summation.   (SR: 155, 398-400, 436-37).

Appellate counsel forcefully argued that requiring a separate motion for a trial order of dismissal elevated form over substance given that it was a bench trial at which the trial judge was deciding all questions of law and of fact.  Appellate counsel also pointed out that defense counsel's arguments during summation regarding the sufficiency of the evidence, even if unpreserved, nonetheless "may be reviewed without preservation as a matter of the weight of the evidence."  (SR: 155).

In addition, appellate counsel reasonably could have decided to focus on the legal insufficiency claim, despite the question of adequate preservation, and forego the ineffective assistance argument.  The legal sufficiency claim, if successful, definitely would have resulted in dismissal of the indictment, unlike reversal based on ineffective assistance of counsel.  *Compare* N.Y. Crim. Proc. Law § 470.20(3) ("Upon a reversal of a judgment after trial for legal insufficiency of trial evidence, the court must dismiss the accusatory instrument."); *with People v. Peters*, 157 A.D.3d 79, 85 (1st Dep't 2017) (finding that appropriate remedy for violation of defendant's right to effective assistance of counsel arising from actual conflict of interest created by counsel's simultaneous representation of defendant and alleged drug buyer, who allocuted to description of drug seller that fit defendant and testified consistently with that allocution at defendant's trial, was new trial at which buyer's testimony would be excluded, not dismissal of indictment).

Petitioner therefore cannot show that appellate counsel's decision not to include an ineffectiveness assistance claim was objectively unreasonable.  The failure to fulfill the deficient performance prong is fatal to Petitioner's challenge to appellate counsel's effectiveness.  *See Strickland*, 466 U.S. at 697.

Even if Petitioner could show that appellate counsel made professionally unreasonable errors, he cannot demonstrate prejudice to the outcome of his appeal.  Had appellate counsel argued that defense counsel was ineffective for failing to preserve the legal sufficiency claim, there is no reasonable probability that the Appellate Division would have been persuaded by that argument.

As noted above, the Appellate Division stated that it evaluated the legal sufficiency of the evidence as part of its review of the weight of the evidence.  Its rejection of the weight of the evidence argument indicates that it likewise determined that the evidence was legally sufficient.  Having found that the evidence was legally sufficient, there is no reasonable probability that the Appellate Division then would have concluded that there was an "absence of strategic reasons for defense counsel's conduct" or that "had counsel made the motions or taken the actions that [Petitioner] now points to, there was any likelihood of success."  *People v. Bombard*, 187 A.D.3d 1417, 1417 (3d Dep't 2020) (rejecting claim that trial counsel was ineffective for failing to preserve legal sufficiency claim where counsel "among other things, engaged in voir dire during jury selection, presented cogent opening and closing arguments, engaged in thorough cross-examination of each witness[,] and argued for a lenient sentence," thereby providing defendant with "meaningful representation").  Because the record does not substantiate either prong of the *Strickland* test, Petitioner's claim that appellate counsel provided constitutionally ineffective assistance does not warrant habeas relief even under a *de novo* standard of review.

VII. **CONCLUSION**

For the reasons above, the Decision and Order (Dkt. 22) is rejected in part and accepted in part; the motion to amend (Dkt. 18) is granted as to Proposed Claim 2 and denied with prejudice as to Proposed Claims 1, 3, and 4; the request for a writ of habeas corpus is denied; and the petition (Dkt. 1), as amended to include Proposed Claim 2, is dismissed. The Court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c)(1). The Clerk of Court is directed to close this case.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:       May 16, 2024
             Rochester, New York